# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| GLENNA P. FLOYD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 2:05-0043** |
| v. | ) | **Judge Wiseman / Knowles** |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff had been disabled since January 22, 2002 (but not prior thereto), and which granted Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 10. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No.13. Plaintiff has filed a Reply. Docket Entry No. 14.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Case 2:05-cv-00043   Document 15   Filed 09/26/06   Page 1 of 39 PageID #: 52

# I.  INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on November 8, 2000, alleging that she had been disabled since August 15, 1996,[1] due to a back injury, tendinitis in both arms, carpal tunnel syndrome in both hands, depression, and thyroid problems.  *See, e.g.,* Docket Entry No. 8 Attachment ("TR"), pp. 62-64, 71-72.  Plaintiff's application was denied both initially (TR 38-39) and upon reconsideration (TR 40-41).  Plaintiff subsequently requested (TR 50) and received (TR 317-348) a hearing.  Plaintiff's hearing was conducted on March 11, 2003, by Administrative Law Judge ("ALJ") Mack H. Cherry.  TR 317.  Plaintiff and Vocational Expert, Dr. Kenneth Anchor, appeared and testified.  TR 317-348.  On appeal, Plaintiff alleges that she has been disabled since January 2000, due to "low back pain, a cervical disc herniation, neuropathy affecting her hands, and chronic obstructive pulmonary disease."  Docket Entry No. 11.

On June 27, 2003, the ALJ issued a decision partially favorable to Plaintiff, finding that Plaintiff was entitled to Disability Insurance Benefits under sections 216(i) and 223 beginning January 22, 2002, but not prior thereto.  TR 16-30.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant has not engaged in substantial gainful activity since January 22, 2002.
>
> 2.  The medical evidence establishes that the claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spines, epicondylitis and mild ulnar neuropathy, and chronic obstructive pulmonary disease and emphysema.

---

[1]Plaintiff subsequently amended her alleged onset date to January 7, 2000.  TR 321.

2

3. The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's assertions concerning her ability to work are partially credible.

5. The claimant retains the residual functional capacity to perform a reduced range of light work.

6. The claimant is unable to perform the requirements of her past relevant work.

7. On January 7, 2000, the claimant was closely approaching advanced age.

8. The claimant has a high school education.

9. The claimant has an unskilled work background.

10. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.13 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform, including work as an office clerk, a customer service clerk, an inventory clerk, and a sales clerk, with over 1.5 million jobs available in the national economy.

11. The claimant was not under a "disability" as defined in the Social Security Act at any time prior to January 22, 2002.

12. Effective January 22, 2002, the claimant was of advanced age.

13. Effective January 22, 2002, based on the claimant's exertional capacity for no more than light work and her education, age, and work experience, a finding of disabled is directed by Medical-Vocational Rule 201.04.

14. The claimant been under a disability, as defined in the Social Security Act, since September [*sic*] 22, 2002.

TR 29-30.

3

On August 12, 2003, Plaintiff timely filed a request for review of the hearing decision. TR 11-12. On March 18, 2005, the Appeals Council issued a letter declining to review the case (TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff initially alleged disability due to a back injury, tendinitis in both arms, carpal tunnel syndrome in both hands, depression, and thyroid problems. TR 72. On appeal, however, Plaintiff alleges disability due to low back pain, a cervical disc herniation, neuropathy affecting her hands, and chronic obstructive pulmonary disease. Docket Entry No. 11.

On August 28, 1996, Plaintiff visited James B. Talmage, M.D., at the Corporate Health Institute in Cookeville, Tennessee, complaining of back pain. TR 160-164. Plaintiff reported that, the day before, she had lifted two boxes simultaneously with a total weight of 20 pounds from a low table to carry them. *Id.* Plaintiff reported that she developed low back pain as she carried the boxes and had to leave work early. *Id.* Plaintiff rated her pain during the night after the injury as a 6 on a scale of 0 to 10, but reported that, by the time of examination, the pain had subsided to a 4. *Id.* Dr. Talmage conducted a physical examination of Plaintiff which revealed "midline tenderness over the L3-4, L4-5, and L5-S1 paraspinous ligament area." *Id.* Dr. Talmage found no reduced muscular tenderness, no palpable visible spasm, and no sign of nerve root tension, but he did find reduced back motion and mechanical back pain when conducting a

4

straight leg raise.  *Id.*

Plaintiff completed a Back Questionnaire form, on which she indicated that she had never had back trouble before her injury on August 27, 1996.  TR 162-164.  Plaintiff answered that she had episodes of pain which required her to rest in bed for relief, and that moving, walking, and bending increased the pain.  *Id.*

Dr. Talmage opined that Plaintiff's injury was probably a ligamentous back strain that would heal with time, and he noted, "A little protection from her injury during this week is probably all she will need."  TR 160.  Dr. Talmage reported that Plaintiff had already visited Quality Medical Care that morning, where they prescribed Cataflam and gave her a note to return to work on light duty.  *Id.*  Dr. Talmage found that Plaintiff could return to modified work duty, and he suggested that she not lift or carry over 10 pounds and not twist until her return appointment in one week.  *Id.*

On September 4, 1996, Plaintiff returned to Dr. Talmage for her one week follow-up examination.  TR 158-159.  Plaintiff reported that she had no difficulty working in her modified work duty.  TR 158.  Dr. Talmage noted that Plaintiff's pain remained primarily in the same place, but had moved slightly to the left since the her visit the week prior.  *Id.*  He further noted that Plaintiff reported that the intensity of her pain fluctuated depending on her activity, and that she took 6 to 8 Tylenol per day for pain control.  *Id.*  Dr. Talmage observed that Plaintiff's "spine move[d] enough to call her low back motion normal."  *Id.*  Dr. Talmage recommended that Plaintiff continue her previous work limitations, and that she exercise and stretch.  *Id.*

On September 10, 1996, Plaintiff returned to Dr. Talmage for another follow-up examination.  TR 156-157.  Plaintiff's physical examination revealed tenderness over the left SI

joint and slightly reduced spinal flexion. TR. 156. Dr. Talmage found "no neurologic deficit, no sign of symptom magnification and no sign of nerve root tension." *Id*. Dr. Talmage noted that Plaintiff needed to increase her aerobic fitness. *Id*. Plaintiff reported that her pain had decreased from a 4 to a 2 on a scale of 0 to 10. *Id*. Dr. Talmage recommended that Plaintiff continue her same modified work duty of lifting or carrying no more than 10 pounds and no twisting. *Id*.

On September 18, 1996, Plaintiff returned to Dr. Talmage for another follow-up examination. TR 154-155. Dr. Talmage noted that Plaintiff's pain was centered over the left SI joint. *Id*. Plaintiff reported that intensity of her pain varied from a 0 to 4 on a scale of 0 to 10. *Id*. She reported no leg pain and no leg numbness. *Id*. Plaintiff's physical examination revealed normal back motion and mild tenderness in the left SI joint. *Id.* Dr. Talmage opined that Plaintiff was "clearly much improved." *Id*. Dr. Talmage continued Plaintiff's modified work duty with the same restrictions. *Id.*

On October 3, 1996, Plaintiff returned to Dr. Talmage for another follow-up examination. TR 152-153. Dr. Talmage noted that Plaintiff continued to experience pain over the left SI joint. TR 152. Plaintiff reported that she was taking 8 tablets of Tylenol or aspirin per day. *Id*. Plaintiff also indicated that she was doing her flexibility exercises twice a day, walking 20 to 25 minutes a day, and lifting 15 pounds for 10 repetitions, but was disappointed because she wanted to increase the weight faster. *Id*. Plaintiff's physical examination revealed only minor tenderness over the left cluneal nerve. *Id*. Dr. Talmage noted Plaintiff's goals of walking 30 minutes a day and lifting 40 pounds, but commented that Plaintiff would have to push herself "a little harder" to attain these goals. *Id*.

On October 23, 1996, Plaintiff returned to Dr. Talmage for another follow-up

examination.  TR 151.  Dr. Talmage conducted a physical examination of Plaintiff which revealed tenderness "where the left cluneal nerves cross the iliac crest" and discomfort by axial stress on the left femur across the SI joint.  *Id.*  Plaintiff reported that she took 8 to 10 extra strength Tylenol per day, and was advised by Dr. Talmage that "8 a day was the absolute upper limit of permissible use."  *Id.*  Dr. Talmage also discussed with Plaintiff the importance of not smoking and of improving her weight lifting ability to improve her back.  *Id*.

On December 10, 1996, Plaintiff returned to Dr. Talmage for another follow-up examination.  TR 150.  Plaintiff's physical examination revealed left SI joint tenderness and less back motion on that visit than in previous visits.  *Id.*  Dr. Talmage noted that Plaintiff had returned to full duty at work and was lifting up to 40 pounds at work without difficulty.  *Id*.

On January 7, 1997, Plaintiff returned to Dr. Talmage for another follow-up examination.  TR 146-147.  Plaintiff's physical examination revealed tenderness in the left SI joint and left cluneal nerve area.  TR 147.  Plaintiff's physical examination revealed "slightly restricted" back motion, "tight hamstrings," and no neurologic deficit.  *Id.*  Dr. Talmage noted that Plaintiff remained at full duty at work with no difficulty.  *Id*.  Dr. Talmage observed that Plaintiff was "looking better" than she had in September and October.  *Id*.  Dr. Talmage discussed the following three treatment options with Plaintiff: (1) to continue to allow time to result in improvement; (2) to try to inject her cluneal trigger point and/or SI joint; or (3) to try back extensor rehabilitation exercises.  *Id*.  Plaintiff elected exercise treatment.  *Id*.

On January 8, 1997, Plaintiff visited Fred Bowen, P.T., at Cookeville Therapy Center for physical therapy.  TR 130-135.  Plaintiff's treatment plan involved lumbar spine flexibility exercises, left SI joint mobilization techniques as well as mobility exercises, and strengthening

7

exercises to the back extensor musculature with the Roman chair as well as the back extensor unit. TR 134. Plaintiff's short term goals were to "improve [her] lumbar spine and left SI joint mobility for more ease of movement." *Id.*

On January 13, 1997, again visited Mr. Bowen for physical therapy. TR 131. Mr. Bowen noted that Plaintiff complained of persistent pain in the left SI joint and lumbar spine regions. *Id.* Mr. Bowen administered ultrasound to Plaintiff's left SI joint region and worked with Plaintiff on mobility and strengthening. *Id.*

On February 6, 1997, Plaintiff returned to Dr. Talmage for another follow-up examination. TR 128-129. Dr. Talmage noted that Plaintiff continued to have pain centered over the left SI joint that she rated as a 4 on a scale of 0 to 10. *Id.* He noted that Plaintiff was "no longer doing the back exercises she [had been] doing"; that "she "only went to a few" of her physical therapy sessions because "she didn't think it helped in her pain and she didn't increase in strength"; and that she walked 30 to 120 minutes at a time, twice per week. *Id.* Dr. Talmage observed that Plaintiff's "back motion [was] almost normal, with some limitation based in tight hamstrings." *Id.* Dr. Talmage approved of Plaintiff's idea of participating in karate with her family. *Id.*

Also on February 6, 1997, Plaintiff underwent an MRI scan of her lumbar spine that revealed "early degenerative changes present at L5-S1," but "no evidence of a left disc herniation." TR 125.

On April 7, 1997, Plaintiff returned to Dr. Talmage for another follow-up examination. TR 126-127. Plaintiff's physical examination revealed tenderness in the left upper SI joint and back pain when performing a straight leg raise. TR 127. Plaintiff reported that bending

8

provoked her pain, but lifting did not. *Id.* She reported doing her yard work, lifting 50 pounds at work, and lifting her grandchildren, all without pain. *Id.* She denied taking prescription medication, but admitted taking 6 to 7 Tylenol per day. *Id.* Plaintiff reported doing 4 different stretching exercises, each with 10 repetitions once per day. *Id.* Dr. Talmage recommended that Plaintiff remain at full duty at work, and noted, "No return visit scheduled - at maximal medical improvement with no permanent impairment." *Id.*

On July 22, 1997, upon referral from "work comp," Plaintiff was examined by Stanley G. Hopp, M.D., at Tennessee Orthopaedic Alliance, in Nashville, Tennessee, for complaints of left-sided low back pain. TR 211-212. Dr. Hopp conducted a physical examination and took x-rays of Plaintiff. *Id.* Dr. Hopp found that Plaintiff's lumbar motion was 80% with pain at the extremes. *Id.* Plaintiff's x-rays "show[ed] four lumbar vertebrae," but was "[o]therwise, negative." *Id.* Dr. Hopp ordered an MRI scan of Plaintiff's lumbar spine. *Id.*

On July 25, 1997, Plaintiff underwent an MRI of her lumbar spine as ordered by Dr. Hopp.[2] TR 240. Plaintiff's MRI revealed "mild degenerative disc disease L5-S1." *Id.*

On August 4, 1997, Dr. Hopp noted that Plaintiff's July 25, 1997, MRI revealed "mild degenerative disc disease L5-S1 without herniation or stenosis." TR 210. Dr. Hopp opined that Plaintiff "has no objective impairment" and he stated, "I would allow her to work without specific restrictions at this time." *Id.*

On August 7, 1997, Plaintiff returned to Dr. Hopp for a follow-up examination. TR 209. Plaintiff continued to complain of low back pain going to the left buttock. *Id.* Plaintiff's physical examination revealed that her "SRT [was] negative," that she was "neurologically

---

[2]There is a duplicate of this examination in the record at TR 297.

intact," and that her "lumbar motion [was] 80% normal." *Id.*  Dr. Hopp reviewed the MRI

findings with Plaintiff, noted that there was "no surgery that [could] help her," and opined that

Plaintiff had "to learn to live with [the pain]." *Id.*

On January 28, 1998, Plaintiff was examined by Dr. Erzinger for complaints of low back

pain.  TR 186-188.  Plaintiff reported pain down her left buttock into the lateral posterior aspect

of the thigh, which terminated at the left knee.  TR 186.  Dr. Erzinger conducted a physical

examination of Plaintiff which revealed slight subjective decreased sensation in the left S1

distribution.  TR 187.  Dr. Erzinger found pain in the upper lumbar region to palpation and found

abnormal straight leg raising in the left leg at 60°.  *Id.*  Dr. Erzinger opined that it could be a

"higher lumbar disk," recommended an MRI of Plaintiff's "L-S spine" and "then perhaps referral

to physical therapy," and prescribed Daypro, Robaxin, and Diazepam.  *Id.*

On February 6, 1998, Plaintiff underwent an MRI scan of her lumbar spine that revealed

"early degenerative changes at L5-S1," but was "otherwise normal."  TR 182-185.

On February 16, 1998, Plaintiff was examined for complaints of lower back pain and

pain in the right biceps.[3]  TR 181.  The physician opined that Plaintiff's pain was probably the

result of a second chronic strain caused by heavy lifting at work, and referred Plaintiff to

physical therapy.  *Id.*  The physician further opined that Plaintiff's bicep pain was tendonitis in

the elbow.  *Id.*

On March 2, 1998, Plaintiff visited Jon A. Simpson, M.D., for complaints of pain in the

arms, hands, and elbows.  TR 180.  Dr. Simpson conducted a physical examination which

revealed that both shoulders were "normal."  *Id.*  Dr. Simpson found that Plaintiff had full range

---

[3]The name of the physician is illegible.  TR 181.

Case 2:05-cv-00043   Document 15   Filed 09/26/06   Page 10 of 39 PageID #: 61

of motion in the elbows, hands, and wrists. *Id*. Plaintiff had a positive Phalen's on the right, but negative Phalen's on the left, and negative Tinel's on both. *Id*. Dr. Simpson found tenderness over the lateral epicondylar area. *Id*. Dr. Simpson prescribed wrist supports and recommended that Plaintiff continue DayPro 600 mgs., two per day. *Id*.

On March 23, 1998, Plaintiff returned to Dr. Simpson for complaints of progressive arm pain. TR 179. Plaintiff's physical examination revealed a full range of motion in the elbows. *Id*. Dr. Simpson opined that there "may be some decreased sensation to light touch in the index and long fingers of the right hand." *Id*. Dr. Simpson concluded that Plaintiff had right upper extremity pain and possible carpal tunnel syndrome. *Id*. Dr. Simpson limited Plaintiff's work to include intermittent rest periods and a lifting restriction of 15 pounds. *Id*. Dr. Simpson prescribed a trial of Naprosyn Ec, one b.i.d. *Id.*

On April 1, 1998, Plaintiff was given an EMG by Randy A. Gaw, M.D., at Neurology & Psychiatry Associates.[4] TR 175-176. Dr. Gaw opined that Plaintiff had mild right ulnar neuropathy. TR 176. Dr. Gaw also found evidence of Martin-Gruber anastomosis and urged "[c]linical correlation." *Id*.

On April 3, 1998, Plaintiff returned to Dr. Erzinger for a follow-up examination regarding her low back pain.[5] TR 177-178. Dr. Erzinger found that Plaintiff had "slight subjective decreased sensation in the left S1 distribution." TR 178. Dr. Erzinger also found "pain in [Plaintiff's] upper lumbar region to palpitation," and abnormal straight leg raising on the left at 60°. *Id*. Dr. Erzinger recommended an MRI scan of Plaintiff's "L-S spine and then

---

[4]There is a duplicate of this examination in the record at TR 299-300.

[5]There is a duplicate of this examination in the record at TR 305-310.

perhaps referral to physical therapy," and she prescribed Daypro, Robaxin, and Diazepam. *Id*.

Also on April 3, 1998, Plaintiff was examined for chronic lower back pain and "terrible" pain in her right elbow.[6]  TR 181.  The physician found tenderness in the right elbow, and prescribed physical therapy.  *Id*.

On April 6, 1998, Plaintiff visited Dr. Simpson for a follow-up examination regarding her EMG nerve conduction studies and complaints of right arm pain.  TR 174.  Plaintiff's physical examination revealed a negative Phalen's, negative Tinel's, full range of motion, and normal color, temperature, and texture.  *Id*.  Plaintiff's EMG nerve conduction study for carpal tunnel syndrome was negative.  *Id*.  Dr. Simpson prescribed Naprosyn.  *Id*.

On May 4, 1998, Plaintiff was examined for complaints of pain in the elbow, arms, and hands.[7]  TR 173.  The physician found that Plaintiff had a repetitive use injury and referred Plaintiff to Dr. Simpson for the pain.  *Id*.

On May 18, 1998, Plaintiff returned to Dr. Simpson for a follow-up examination regarding her complaints of pain over the lateral aspect of the right elbow and similar symptoms in the left.  TR 172.  Plaintiff's physical examination revealed "isolated pain over the lateral epicondyle of the right elbow and some over the left elbow over the lateral epicondyle but much less."  *Id*.  Dr. Simpson prescribed a trial of Voltaren, and recommended that Plaintiff continue her work with a lifting restriction of 15 pounds for her right hand.  *Id.*

On June 15, 1998, Plaintiff returned to Dr. Simpson for a follow-up examination regarding her complaints of work-related right hand, forearm, and lateral elbow pain.  TR 171.

_____

[6]The physician's name is illegible.  TR 181.

[7]The physician's name is illegible.  TR 173.

12

Plaintiff's physical examination revealed tenderness over the lateral epicondylar area of her elbow, but no atrophy of the forearm. *Id*. Dr. Simpson noted that Plaintiff's symptoms of depression were increasing. *Id*. Dr. Simpson prescribed Relafen and Prozac, and opined that Plaintiff could continue working at a regular light duty position. *Id*.

On July 8, 1998, Plaintiff visited Susan N. Pick, M.D., for an evaluation of bilateral arm and hand pain. TR 170. Plaintiff's physical examination did not reveal any evidence of swelling or muscular atrophy, and Plaintiff exhibited good range of motion in her shoulder, elbow, wrist, and hand. *Id*. Dr. Pick found pain with extension of Plaintiff's elbows, wrists, and digits, as well as point tenderness to palpation over the lateral epicondyle and extensor muscle mass. *Id*. Plaintiff's Tinel's and Phalen's tests were negative. *Id*. Dr. Pick diagnosed "bilateral lateral epicondylitis." *Id*. Dr. Pick recommended that Plaintiff wear tennis elbow straps on a full-time basis, prescribed a Sterapred Dose Pak, sent Plaintiff to physical therapy, and allowed Plaintiff to continue working. *Id.*

On July 31, 1998, Plaintiff returned to Dr. Talmage for a follow-up examination regarding her low back strain. TR 122-124. Plaintiff's physical examination revealed "mild tenderness" over the left SI joint and "slightly reduced" spinal flexion and extension. TR 123. Dr. Talmage found "straight leg raising provoked mechanical back pain at about 50 to 70 degrees of elevation of the left leg" and mild low back or SI discomfort when Plaintiff was "supine with her hip at 90 degrees and knee bent 90 degrees, axial compression along the femur." *Id*.

On August 5, 1998, Plaintiff returned to Dr. Pick for a follow-up examination regarding her "bilateral lateral epicondylitis." TR 169. Plaintiff's physical examination revealed

13

tenderness to palpation over the lateral epicondyle and extensor muscle mass. *Id*. Dr. Pick recommended that Plaintiff continue to take Prednisone and injected Plaintiff's right lateral epicondyle with Solu-Medrol and Marcaine. *Id*. Dr. Pick recommended that Plaintiff wear tennis elbow straps and continue her stretching exercises. *Id.*

On August 26, 1998, Plaintiff returned to Dr. Pick for a follow-up examination regarding her "work-related bilateral tennis elbow and left wrist pain." TR 168. Dr. Pick conducted a physical examination of Plaintiff which revealed tenderness to "palpitation over the right lateral epicondyle," pain with stress of the ECRB, tenderness over the extensor muscle mass, pain over the volar aspect of the left wrist, and minimal pain over Plaintiff's left lateral epicondyle. *Id*. Dr. Pick noted that she believed Plaintiff's symptoms were "somewhat exaggerated." *Id*. Dr. Pick recommended that Plaintiff wear the tennis elbow strap on right upper extremity at work and the wrist spilt on the left upper extremity. *Id*.

On September 23, 1998, Plaintiff returned to Dr. Pick for another follow-up examination. TR 166-167. Plaintiff's physical examination showed no evidence of any swelling or muscular atrophy of the upper extremities and a full range of motion in her shoulders, elbows, wrists, and hands. TR 166. Dr. Pick noted that a neurologic examination of the upper extremities revealed "questionable effort exhibited by the patient on muscular exam." *Id*. Dr. Pick concluded that she felt that Plaintiff exhibited "symptom magnification and lack of effort with respect to the testing." *Id*. Dr. Pick concluded that there was "no reason to restrict [Plaintiff's] work with respect to any activities or weight limitations," and that Plaintiff did not retain "any permanent partial impairment secondary to her work related upper extremity problems." *Id*.

On April 22, 1999, Plaintiff returned to Dr. Talmage for a follow-up examination

14

regarding her low back strain, as well as complaints of leg pain and gastrointestinal problems. TR 117-121. Plaintiff's physical examination revealed "tenderness that localizes to the paraspinal attachment to the left crest in the region of the cluneal nerve tender point." *Id*. Dr. Talmage opined that Plaintiff had "chronic persisting backache that is tolerable and has allowed her to remain at full duty," and recommended that Plaintiff remain at full work duty and wear a "warm and form lumbosacral orthosis," which he prescribed. TR 120-121.

On April 26, 1999, Plaintiff visited Dr. Pick for a follow-up examination regarding her "work related upper extremity problems." TR 165. Dr. Pick noted that Plaintiff felt that her hands were "getting worse," that she was "dropping things," that she was "having to use two hands to pick things up," and that she was "having significant night pain." *Id.* Plaintiff complained of pain in the "mid palmar area and extending up the volar aspect of the forearm to the lateral aspect of the elbow." *Id*. Plaintiff's physical examination revealed "no evidence of any swelling nor muscular atrophy of the upper extremities," as well as a full range of motion of the shoulders, elbows, wrists, and hands. *Id*. Dr. Pick also found: "questionable pain about the lateral epicondyle with stress of her ECRB in both the right upper extremities; however, this radiation of pain is up the volar aspect of the arm to the lateral epicondyle which is not what would be expected." *Id*. Dr. Pick noted that Plaintiff had hyper-sensitivity to light touch on the tips of her fingers. *Id*. Dr. Pick concluded that Plaintiff had recurrent tennis elbow symptoms and recommended that Plaintiff wear a tennis elbow strap on her right upper extremity. *Id*

On June 23, 1999, Dr. Erzinger prescribed physical therapy and Darvocet for Plaintiff. TR 192-193.

On July 8, 1999, Plaintiff visited Dr. Harrison for complaints of bilateral hand and arm

pain and dysesthesias that were greater on the right than on the left. TR 202-205. Dr. Harrison conducted a physical examination and took x-rays. TR 203-204. Plaintiff's physical examination revealed mild tenderness over the right lateral epicondyle, significant epicondylar pain in the left elbow, vague tenderness to palpation over the dorsal radial musculature of forearm, minor palmar tenderness and similar, but less prominent, pattern of pain in the left forearm and hand. *Id*. Plaintiff's x-rays of the hands, wrists, and right elbow were "within normal limits." TR 204. Dr. Harrison ruled out underlying multi-focal motor neuropathy, and diagnosed mild right lateral epicondylitis and mild bilateral forearm strain. *Id*. Dr. Harrison opined that Plaintiff, "on clinical grounds, does not appear to have any severe orthopaedic or neurological abnormality," and that Plaintiff could continue her then-current work status. *Id*.

On December 7, 1999, Plaintiff returned to Dr. Harrison for a follow-up examination. TR 200-201. Plaintiff complained of hand pain in the volar radial wrist area extending into the palmar region and up into the index finger and sometimes the thumb. TR 200. Plaintiff's physical examination revealed "no new changes." *Id*. Dr. Harrison noted that Plaintiff's "right shoulder, elbow, forearm, wrist and hand move fully," and that both Plaintiff's Tinel's and Phalen's tests were "unimpressive." *Id*. Plaintiff's examination also revealed some "palpable tenderness" and "mild numbness." *Id*. Dr. Harrison noted that Plaintiff exhibited some features of fibromyalgia. *Id*. Dr. Harrison concluded, " I cannot, with medical certainty at this time, establish any evidence of permanent partial physical impairment." *Id*.

Plaintiff visited Sibyl E. Wray, M.D., for complaints of hand pain and difficulties with gripping objects.[8] TR 195-196. Dr. Wray conducted a neurologic examination of Plaintiff

---

[8]Dr. Wray's evaluation is undated.

which revealed "some APB wasting." *Id*. Dr. Wray noted, "I am not sure that she is giving full

effort in her APB." *Id*. Dr. Wray found that while Plaintiff had subjective sensory loss, she had

intact modalities to testing. *Id*. Dr. Wray also found that Plaintiff's "finger flexors [were]

absent." *Id*. Dr. Wray ordered a cervical spine MRI, laboratory evaluation, and EMG Nerve

Conduction Study. *Id*.

On January 7, 2000, Plaintiff underwent the MRI of the cervical spine ordered by Dr.

Wray.[9] TR 238. Plaintiff's MRI revealed "fairly large central and left paracentral disc

herniation at the C5-6 level." *Id*.

On May 2, 2000, Plaintiff visited Renata Nowak, M.D., in Crossville, Tennessee, for an

initial examination.[10] TR 283-284.

On July 13, 2000, Plaintiff visited Dr. Nowak for a refill of her Synthroid prescription.

TR 281. Dr. Nowak called in the prescription to Wal-Mart and wanted to see Plaintiff again in 6

weeks. *Id*.

On August 10, 2000, Plaintiff again visited Dr. Nowak for complaints of back pain. TR

280-281. Plaintiff's physical examination revealed tenderness in the lower back, but no

tenderness in the hip and no swelling. *Id*. Dr. Nowak prescribed Vioxx and Tylenol.[11] *Id*.

On October 13, 2000, Plaintiff visited Dr. Nowak for complaints of lower back pain. TR

279. Dr. Nowak prescribed Tylenol and Vioxx.[12] *Id.*

_____

[9]There is a duplicate of this examination at TR 298.

[10]Dr. Nowak's notations are illegible.

[11]Dr. Nowak's third prescription is illegible.

[12]Dr. Nowak's third prescription is illegible.

17

On November 15, 2000, Plaintiff visited Robert P. Yatto, M.D., in Crossville, Tennessee, for complaints of chest pain and "recurrent regurgitation." TR 275-278. Dr. Yatto conducted a physical examination of Plaintiff which was "unremarkable." TR 275. Dr. Yatto ordered an EGD in which he found "inflamation in the antrum... biopsies were taken and H. Pylori was identified in the mucosa." *Id*. Dr. Yatto prescribed Prevpac. *Id*.

On November 22, 2000, Plaintiff visited Joseph A. Jestus, M.D., for complaints of low back pain. TR 215-216. Plaintiff's physical examination revealed point tenderness about her left SI joint region. TR 215. Dr. Jestus opined that Plaintiff's pain could be from a lumbar disc extrusion, facet arthritis, sacroiliitis, or hip arthritis. TR 216. Dr. Jestus recommended an MRI scan of Plaintiff's lumbar spine to determine the cause of her pain. *Id*.

On December 1, 2000, Plaintiff returned to Dr. Jestus to discuss the results of her MRI scan. TR 214. Plaintiff's MRI results were negative with the exception of "mild degenerative disc disease at L5/S1." *Id*. Dr. Jestus told Plaintiff that the source of her pain was indeterminate; however it was likely from disc degeneration or sacroiliitis. *Id*. Dr. Jestus recommended SI joint injections. *Id.*

On January 23, 2001, Denise Bell, M.D., completed a Residual Functional Capacity ("RFC") Assessment form concerning Plaintiff. TR 109-116. Dr. Bell opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 25 pounds, stand and/or walk (with normal breaks) for at least 6 hours in an 8 hour workday, sit (with normal breaks) about 6 hours in an 8 hour workday, and push and/or pull without limitation. TR 110. Dr. Bell did not indicated any other limitations on the form. TR 109-116.

On February 26, 2001, Plaintiff visited John R. Thompson, M.D., for complaints of back

18

pain.[13]  TR 235.

On April 5, 2001, Plaintiff was examined by Mark A. Loftis, M.A., L.P.E, on behalf of the Tennessee Disability Determination Services.  TR 217-219.  Mr. Loftis conducted a psychological evaluation of Plaintiff, in which Mr. Loftis concluded that Plaintiff was suffering from "major depressive disorder, recurrent with moderate features."  *Id.*  He also noted that Plaintiff had a "history of tendonitis, carpal tunnel syndrome, thyroidism, and depression," and that she had a "poor primary support group."  *Id.*  Plaintiff's GAF was 65.  *Id.*

On April 17, 2001, Karen B. Lawrence, Ph.D, partially completed a Psychiatric Review Technique Form concerning Plaintiff, in which she indicated that Plaintiff had a mild restriction of activities of daily living and mild difficulties in maintaining social functioning.  TR 220-233.

On July 19, 2001, Plaintiff visited Dr. Thompson for complaints of back pain and pain in her left buttock.  TR 234.  Dr. Thompson ordered an MRI of the lumbar spine.  *Id.*

On July 23, 2001, Plaintiff visited White County Community Hospital for the MRI of her lumbar spine ordered by Dr. Thompson.  TR 236.  Plaintiff's MRI revealed "degenerative disc desiccation with nominal noncompressive central disc protrusion with small annular rent."  *Id.*

On August 9, 2001, Plaintiff returned to Dr. Thompson for a follow-up examination regarding her MRI.  TR 234.  Dr. Thompson noted that Plaintiff's MRI revealed compression in L5-S1.  *Id.*  Dr. Thompson prescribed Darvocet.  *Id.*

On February 2, 2002, Plaintiff visited Dr. Wray for complaints of pain and numbness in her hands.  TR 194.  Dr. Wray conducted a physical examination and neurologic examination of Plaintiff.  *Id.*  Plaintiff's physical examination revealed that her neck was "supple without bruits"

---

[13]The handwritten chart by Dr. Thompson is illegible.

and that her heart had a "regular rate and rhythm." *Id*. Regarding Plaintiff's neurologic examination, Dr. Wray noted:

> She gives better effort today on her exam. Her right triceps remains 4+ and the left are 5-. Her right wrist extensors are 5- and left are 4+ and her opponens are 4+, but she gives a good effort with her APB bilaterally and does not appear particularly weak. **DTRs:** 2+ and symmetric in the biceps and brachioradialis and 2- at the triceps. There is definitely a difference here. She is 2+ throughout in her lower extremities. Her toes are mute. She has no finger flexors today on the left but I did obtain a reflex on the right.

*Id*. (Emphasis original.) Dr. Wray referred Plaintiff to Dr. Sanders for evaluation of her herniated disc, and noted that Plaintiff had yet to complete her scheduled EMG Nerve Conduction Study. *Id*.

On February 27, 2002, Plaintiff was examined by Pushpendra K. Jain, M.D., at the Cookeville Medical Center, for complaints of fatigue, cough, and neck stiffness. TR 253-256. Plaintiff's physical examination was "normal." TR 254-255. Dr. Jain prescribed Tessalon Perles, Augmentin and Vioxx. TR 256. Dr. Jain also ordered laboratory tests. TR 255-256. The results returned abnormal readings for TT4, TSH, Cholesterol, Triglycerides, LDL cholesterol, RDW, and Sodium Serum. TR 257-268.

On March 8 2002, Plaintiff underwent x-rays which revealed osteopenia of the spine with osteoporosis of the hip. TR 245.

On March 11, 2002, Plaintiff underwent an Electrocardiogram which revealed normal sinus rhythm and low QRS voltages in precordial leads. TR 244. Hosakote Nagaraj, M.D., suggested considering anterior myocardial infarction. *Id*.

On March 19, 2002, Plaintiff underwent a chest x-ray which revealed benign essential

hypertension. TR 245.

On March 22, 2002, Plaintiff returned to Dr. Jain's office complaining of chest congestion and cough. TR 242-244. The results of Plaintiff's physical examination were "normal." *Id.* Plaintiff's diagnoses included osteoarthritis, osteoporosis, emphysema, cough, "tobacco dependence syndrome," hypothyrodism, and hypercholestrolemia. TR 246-247. Plaintiff was prescribed vioxx, fosamax, fluticasone propionate, albuterol sulfate, tessalon perles, wellbutrin, synthroid, and lovastatin. TR 246-247.

On February 20, 2003, Plaintiff visited Dr. Jain for a follow-up examination and complaints of high blood pressure, arm pain, and headache. TR 301-304. Plaintiff's physical examination revealed chest congestion and cough. TR 302. Dr. Jain reviewed a chest x-ray taken in March 2002, and concluded that Plaintiff was suffering from osteoporosis, osteoarthritis, and benign essential hypertension. TR 304. Dr. Jain prescribed anaprox DS and Cyclobenzaprine HCI. *Id.*

Also on February 20, 2003, Dr. Jain completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form concerning Plaintiff. TR 294-296. Dr. Jain indicated that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk at least 2 hours in an 8 hour workday and sit (with normal breaks) less than 6 hours in an 8 hour workday. TR 294-295. Dr. Jain also noted that Plaintiff would be affected by pushing and/or pulling in the upper extremities. TR 295. Dr. Jain further noted that Plaintiff would be required to periodically alternate siting and standing to relieve pain due to "degenerative disease of spine and disc." *Id.* Dr. Jain indicated Plaintiff would frequently experience pain severe enough to interfere with attention and concentration, and that Plaintiff

21

would need to take unscheduled breaks "every 1 hour or so." *Id.* Dr. Jain also indicated that Plaintiff's impairments would produce good and bad days and that Plaintiff would miss work more than 4 times a month from her impairments or treatments. *Id.* Dr. Jain also indicated that Plaintiff could occasionally climb, balance, kneel, crouch, or crawl throughout the workday. *Id.* Dr. Jain noted that Plaintiff had limited handling, fingering, and feeling abilities. TR 296. Dr. Jain also recommended that Plaintiff avoid concentrated exposure to humidity/wetness and fumes, odors, dusts, and gases. *Id.*

### B. Plaintiff's Testimony

Plaintiff was born on January 23, 1947, and has a high school education and vocational training in real estate sales, office management, appraisal, and real estate appraisal. TR 321-322.

Plaintiff testified that she had attended school through the 10th grade and later received a GED diploma. TR 321. Plaintiff stated that she did not have a then-current real estate license and that she had last had a real estate license in 1986. TR 322. Plaintiff stated that she had worked for Robert Shawl CB Automotive since February 2, 1994. *Id.* Plaintiff described the job as having "a lot of walking, lifting, sitting, just different categories of work." *Id.* Plaintiff reported that, on some days, she would have to sit all day, and on other days, she would have to sit for only half the day. TR 323. Plaintiff noted that she had lifted 20 or 30 pounds when she started working, but had lifted only 5 or 10 pounds when she stopped working. *Id.* Plaintiff stated that this reduction in lifting was because she had injured her back. *Id.* Plaintiff noted that she had a pending Worker's Compensation claim that had been non-suited, and that she had until August of 2003 to refile. *Id.*

Plaintiff stated that, before working for Robert Shawl CB Automotive, she had worked at

Precision Molding for 3 or 4 weeks (TR 323-324), and that prior to working there, she had

worked for Harold Alred and Associates as a real estate agent, from around 1986 to 1989 (TR

324). Plaintiff reported that her job as a real estate agent had required a lot of walking and that

she would spend at least half the day standing or walking. *Id*. Plaintiff noted that she had not

had to lift objects while working in real estate. *Id*. Plaintiff further stated that she wrote listings,

sales contracts and sometimes closing cost reports. *Id*. Plaintiff stated that she stopped working

with the real estate company because the office closed and the owner started another company,

but she did not follow. TR 338. Plaintiff stated that she had been an affiliate broker. TR 341.

Plaintiff also reported that she had worked as a doctor's assistant and dental assistant in 1980.

TR 338-39. Plaintiff stated that Alred, Precision Molding, and CB Automotive, were the only

jobs she that she had had in the previous 15 years. TR 324-325.

Plaintiff testified that she had problems sitting for long periods of time. TR 325.

Plaintiff stated that she had pain in her back, neck, and shoulders which caused headaches. *Id*.

Plaintiff reported that she did not drive, write, or use the computer "a lot." *Id*. Plaintiff stated

that the pain in her lower back went into her hip and upper back, and that the pain in her neck

went into her arms and up her neck, which caused headaches. TR 326. Plaintiff testified that she

had trouble turning her head from side to side. *Id*. Plaintiff also stated that it was difficult to

grip objects because her hands would get numb. *Id*. Plaintiff stated that she had numbness in the

"lower parts" of the fingers, and that sometimes all of her fingers were numb, resulting in

difficulty picking up items. TR 327. Plaintiff reported that the problems with her hands dated to

about 3 years prior to the hearing. *Id*.

Plaintiff described the pain in her neck as starting below the skull and radiating through

Case 2:05-cv-00043   Document 15   Filed 09/26/06   Page 23 of 39 PageID #: 74

the shoulders and down the arms, which she reported caused the muscles to tighten, resulting in stiffness and soreness in her back.  TR 328.  At the time of the hearing, Plaintiff rated her neck pain as a 5 on a scale of 0 to 10.  *Id*.  Plaintiff testified that the pain could get up to a 10 if she were under stress or pushed herself, and that this occurred 2 or 3 times a week.  TR 328-329. Plaintiff stated that the pain would stay with her all day until she took enough medicine to go to sleep.  TR 329.

Plaintiff stated that she did not take any prescription medication because she had lost her insurance and could not afford to buy it.  TR 329.  Plaintiff reported that she had been without medication for "probably over a year."  *Id*.  Plaintiff stated that the medication she had taken would make her sleepy and that she liked to sleep because it made the pain go away.  *Id*.

Plaintiff classified the pain in her neck as a dull pain, and described the pain in her lower back at the hearing as a 7 on a scale of 0 to 10.  TR 330.  Plaintiff further stated that she could "keep [the pain] down" if she just relaxed and did not do anything.  *Id*.

Plaintiff stated that she could sit for approximately 20 to 30 minutes before experiencing pain.  TR 330.  Plaintiff also stated that she could walk for approximately 30 minutes before the pain started. TR 331.  Plaintiff testified that she usually did not lift items over 5 pounds, and that she did that only if she had to.  *Id*.  Plaintiff further testified that she could stand for 10 or 15 minutes, and that her back would begin to hurt if she stood in one place.  *Id*.

Plaintiff testified that she also had problems breathing.  TR 332.  Plaintiff reported that she would have difficulty breathing if she overexerted herself, and noted that she would become short of breath if she climbed a flight of stairs.  *Id*.  Plaintiff stated that she had to sleep on her side because she would cough when lying flat.  *Id*.  Plaintiff reported that chemical fumes and

smoke aggravated her breathing problems. *Id.* Plaintiff stated that she smoked "maybe a pack a day now." *Id.* Plaintiff reported that she had previously smoked "maybe two packs, two packs and a half some days." *Id.*

Plaintiff testified that she had difficulty with depression. TR 333. Plaintiff stated that she had problems coping with ordinary problems. *Id.* Plaintiff stated that she was supposed to be taking medication, but was not able to because she did not have insurance. *Id.* Plaintiff reported that her pain sometimes interfered with her ability to concentrate. *Id.*

Plaintiff reported that she would sometimes play computer games for "a few minutes," but stated that she could not use the computer for more than a few minutes because her hands would begin to hurt and become cold. TR 333-334. Plaintiff reported that she watched television, but was unable to watch an hour long program because she would have to get up and move around to stop the pain. TR 334. Plaintiff stated that her daughter would usually cook for the family, but that she would cook "maybe once a week." TR 334-335. Plaintiff stated that she did not mop or vacuum, but that she swept "maybe every two or three days" and dusted "maybe once, twice a week." TR 335. Plaintiff stated that she folded clothes from the laundry, but did not take the clothes out of the dryer. *Id.* Plaintiff reported that she worked in the yard "every once in a while," but did not mow. TR 336. Plaintiff stated that she would drive a car 2 to 3 times a week for approximately 2 miles. *Id.*

Plaintiff stated that she had problems sleeping at night because she had to adjust her body so that her neck and shoulders would not hurt. TR 336. Plaintiff stated that she would lie down everyday whenever she was tired or in pain, and added that she would lie down 2 or 3 times a day for 15 to 20 minutes and take a nap for 1 to 2 hours per day. TR 336-337. Plaintiff stated

25

that she did not go out socially with her family, did not go to church, and did not visit friends. TR 337. Plaintiff stated that her family would come to visit her. *Id*. Plaintiff stated that she did not have a handicapped parking permit. TR 338.

Plaintiff reported that she had previously worked as a dental assistant, doctor's assistant, real estate agent, and parts assembler, but that the only job that she had had in the 15 years prior to the hearing was as a parts assembler. TR 338-339. Plaintiff stated that, as a parts assembler, she had to pick up boxes and carry them around. TR 339. Plaintiff added that the last 2 or 3 years of her job she worked on a line that tested the parts, and reported that she would have to "start the part from scratch and assemble it." *Id.* Plaintiff stated that she would have to stand and walk to test the part and then would have to pack it and get it ready for shipping. *Id*. Plaintiff testified that she had not had supervising job, but that for the last year and a half had been the only person who knew the job because everyone else was new. TR 339-340. She reported that she had to "show them and tell them what to do besides doing my own job." TR 340.

Plaintiff reported that, in 1998, her physician had placed her on a 15 pound lifting limitation, with "more rest breaks," and "a little more limited in [her] right hand." TR 340. Plaintiff stated that she "could do whatever I felt like doing at the time because I had so many other people that I could tell to do it, so they basically just let met do it that way... take the breaks and you know, just make sure the part got out and that it got out right and I did what I could." *Id*. Plaintiff stated that she had been laid off from that job in November 2000 when the plant closed and moved to Mexico. *Id*.

Plaintiff stated that she had applied for TennCare, but was denied because her husband

had been drawing unemployment and was told he made too much money. TR 341. Plaintiff stated that she, her husband, and her 14 year old grandson all lived in her home. TR 341-342. Plaintiff stated that her daughter lived elsewhere, but came down "quite a bit" to help out. TR 342. Plaintiff testified that she had 3 daughters, and that she would see them about every other day. *Id*. Plaintiff stated that her house was one story, with no stairs, and that walking up stairs made her back hurt. TR 342-343. Plaintiff stated that she would "pick up" around the house, but not do a "good cleaning," and that she would "sometimes" wash dishes. TR 343. Plaintiff testified that she did not go to church or social events, but would "occasionally" work in the yard. *Id*.

Plaintiff reported that she had received injections in her elbow, but had not undergone a carpal tunnel release because her insurance had run out. TR 343.

Plaintiff stated that she did not have problems getting dressed. TR 344. Plaintiff testified that the weather had an effect on her, and that moisture in the air caused her joints to hurt. *Id*. Plaintiff stated that her condition had remained "about the same" over the course of the previous year. *Id*.

### C. Vocational Testimony

Vocational Expert ("VE"), Kenneth Anchor, also testified at Plaintiff's hearing. TR 344-348. With regard to Plaintiff's past relevant work history, the VE classified Plaintiff's work in auto parts assembly as light and unskilled, and her work in real estate as light and skilled. TR 344-345.

27

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff[14] and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 345. The VE answered that the hypothetical claimant could not perform the past work of Plaintiff. TR 345-346. The VE opined, however, that the positions of office clerk, customer service clerk, inventory clerk, and sales clerk would be appropriate for the hypothetical claimant, and that there were approximately 29,000 such jobs in the State of Tennessee, and almost 1.5 million in the nation economy. TR 346.

The ALJ then modified the hypothetical to include a "moderate limitation in the ability to maintain attention and concentration [INAUDIBLE] pain and discomfort." TR 346. The VE stated that this limitation would eliminate at least 25 to 30% of the originally listed jobs. *Id*.

The ALJ again modified the hypothetical to include a severe limitation in the ability to maintain attention and concentration. TR 346-347. The VE responded that this limitation would eliminate all the jobs available to the original claimant. *Id*.

The ALJ asked the VE whether there would be any jobs available for Plaintiff if her testimony was found fully credible. TR 347. The VE responded that, "if the difficulties that were described during testimony here this morning are at the severe level, if they're chronic, persistent and tractable, unmanageable, I don't believe the minimal requirements of full-time

_____

[14]The ALJ's hypothetical claimant had the same age and education as Plaintiff. TR 345. Additionally, the hypothetical claimant was limited to light work, had a lifting restriction of 15 pounds, had a sit/stand option, was limited in push, pull capability in the upper extremities, was limited in repetitive grip with dominant hand, could not use ladders, ropes or scaffolds, could not crawl, could occasionally climb stairs, ramps, balance, stoop, bend, kneel or crouch, should avoid extremes in temperature, dampness, wetness, and humidity, and vibrating hand tools, should avoid fumes, odors, dust, gases, and the like, had a moderate limitation to hazardous machinery and unprotected heights, had a moderately limited ability to rotate the neck up and down, had and moderate difficulty in dealing with moderate stresses. *Id*.

gainful activity could be satisfactorily fulfilled." *Id.*

## III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484

29

F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

30

"listed" impairments[15] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[15]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

31

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

As discussed above, the ALJ awarded Plaintiff DIB beginning January 22, 2002, but not prior thereto. Plaintiff's appeal, therefore, concerns only the ALJ's determination that Plaintiff was not entitled to DIB prior to January 22, 2002.

Plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Jain, Plaintiff's treating physician, and erred in finding that Plaintiff could perform a limited range of light work. Docket Entry No. 11. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171,

32

176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. Weight Accorded to Opinion of Plaintiff's Treating Physician**

Plaintiff maintains that the ALJ erred in rejecting the opinion of Dr. Jain, her treating

physician. Docket Entry No. 11. Specifically, Plaintiff argues that the ALJ erred by not

adopting Dr. Jain's assessment that Plaintiff would not be capable of performing even sedentary

work, as expressed in the Medical Source Statement of Ability to do Work-Related Activities

(Physical) form completed on February 20, 2003. TR 294-296.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical
> opinion we receive. Unless we give a treating source's opinion
> controlling weight under paragraph (d)(2) of this section, we
> consider all of the following factors in deciding the weight we give
> to any medical opinion.
> (1) Examining relationship. Generally, we give more
> weight to the opinion of a source who has examined you than to
> the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more
> weight to opinions from your treating sources, since these sources
> are likely to be the medical professionals most able to provide a
> detailed, longitudinal picture of your medical impairment(s) and
> may bring a unique perspective to the medical evidence that cannot
> be obtained from the objective medical findings alone or from
> reports of individual examinations, such as consultative
> examinations or brief hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature and severity of your
> impairment(s) is well-supported by medically acceptable clinical
> and laboratory diagnostic techniques *and is not inconsistent with*
> *the other substantial evidence in your case record*, we will give it
> controlling weight. When we do not give the treating source's
> opinion controlling weight, we apply the factors listed in
> paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the
> factors in paragraphs (d)(3) through (d)(6) of this section in
> determining the weight to give the opinion. ...
> (3) Supportability. The more a medical source presents

33

relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Jain began treating Plaintiff in February 2002, and treated Plaintiff for some time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions. *See* TR 253-256. Dr. Jain's February 20, 2003, assessment, however, contradicts other substantial evidence in the record, including his own treatment notes. That assessment contradicts the records of Dr. Talmage, Dr. Pick, Dr. Harrison, and Dr. Bell, and also belies the conservative nature of Plaintiff's treatment. In rejecting Dr. Jain's assessment, the ALJ specifically noted:

Dr. Jain evaluated the claimant as having the residual functional capacity for less than a full range of work at any exertional level. His own treatment records do not support a conclusion that she has

34

> such severe limitations.  On his first examination on February 27,
> 2002, for example, he noted that she had normal sensation,
> strength, and reflexes, and full range of motion in all of her joints.

TR 27.

The ALJ further noted that "the objective medical evidence does not show that any of [Plaintiff's] impairments have worsened significantly enough to warrant more severe limitations."  TR 27.

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2).  Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence, and the final decision regarding the weight to be given to the differing opinions lies with the Commissioner.  20 C.F.R. § 416.927(e)(2).  Because Dr. Jain's assessment is inconsistent with other evidence in the record, the Regulations do not mandate that the ALJ accord Dr. Jain's evaluation controlling weight.  Accordingly, Plaintiff's argument fails.

**2.  Residual Functional Capacity**

Plaintiff also maintains that the ALJ erred in finding that Plaintiff retained the Residual Functional Capacity to perform a limited range of light work.  Docket Entry No. 11.

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c).  With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature
> and extent of your physical limitations and then determine your

35

> residual functional capacity for work activity on a regular and
> continuing basis. A limited ability to perform certain physical
> demands of work activity, such as sitting, standing, walking,
> lifting, carrying, pushing, pulling, or other physical functions
> (including manipulative or postural functions, such as reaching,
> handling, stooping or crouching), may reduce your ability to do
> past work and other work.

20 C.F.R.§ 404.1545(b).

When determining a claimant's Residual Functional Capacity, the ALJ must consider all

symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as

consistent with the objective medical evidence. 20 CFR § 404.1529. The ALJ must additionally

consider any medical opinions from acceptable medical sources that reflect judgments regarding

the nature and severity of the impairments alleged and the resulting limitations. 20 CFR §

404.1527.

The record in the case at bar is replete with doctors' evaluations, medical assessments,

and test results, all of which were considered and discussed by the ALJ in his decision. TR 17-

30. Moreover, the ALJ's determination that Plaintiff retained an RFC to perform light work is

supported by the testimony of both Plaintiff and the VE.

When determining that Plaintiff retained an RFC for light work, the ALJ specifically

articulated, *inter alia*, as follows:

> The objective medical evidence indicates that the claimant injured
> her back in August of 1996 and has reported chronic back pain
> since that time. However, tests and examinations have consistently
> failed to reveal an impairment which would reasonably be
> expected to cause pain of the severity and duration alleged. Four
> MRI's have revealed only mild degenerative disc disease at one
> level of the lumbar spine, with no evidence of a more serious
> impairment such as a herniated disc, a fracture, stenosis, or

spondylosis. It is significant that the claimant continued to work for over 3 years after her injury, and 2 years later reported that she was again lifting 50 to 60 pounds. She has received only conservative treatment, and surgery has never been suggested or considered.

The claimant has reported pain and numbness in her left leg and foot, but there is no objective medical evidence that there is a radicular component to her back disorder. Tests have consistently failed to reveal a condition which would cause her reported symptoms, such as a herniated lumbar disc, stenosis, or encroachment on a nerve root. The claimant has consistently exhibited substantially normal gait, strength, sensation, and reflexes in her lower extremities.

The pain and numbness the claimant has reported in her hands and arms was diagnosed as symptoms of epicondylitis, or "tennis elbow." Tests ruled out carpal tunnel syndrome. Ulnar neuropathy was diagnosed, but this was classified as mild and was assessed by Dr. Harrison as causing no significant limitations in the claimant's ability to work.....

The claimant has managed to continue performing a wide range of daily activities despite her reported pain and discomfort. It is significant that she continued to engage in full time work despite her impairments until November of 1999, and quit work then not due to any functional limitations but due to the closing of her place of employment. She indicated that she was successfully working at a light level of duty at that time, and there is no indication that she could not have continued to do so had the plant not closed.

...

The claimant was capable of working at a light duty level, which was described as involving the lifting and carrying of a maximum of 15 pounds, despite her impairments, at the time her place of employment closed, and the objective medical evidence does not show that any of her impairments have worsened significantly enough to warrant more severe limitations since that time. She briefly returned to heavier lifting, but this apparently exacerbated her condition. Accordingly, it is reasonable to conclude that she should lift and carry no more than 15 pounds. There is no objective medical evidence of an impairment or combination of

37

impairments which would prevent the claimant from sitting, standing, or walking for as much as 6 hours each in an 8-hour work day. However, she would require the option of frequently changing position at will to relieve the pain and discomfort which her back and neck impairments would reasonably be expected to cause, referred to as a sit/stand option.

The claimant would have a limited ability to push and pull with her right upper extremity, and would be unable to engage in repetitive gripping with her right hand. She would have a restricted ability to move her neck up and down. She could not climb ramps, ladders, and scaffolds or crawl, and she could only occasionally perform such postural activities as climbing stairs, stooping, kneeling, crouching, and crawling. She should avoid concentrated exposure to extremes of temperature and humidity, vibrations, pulmonary irritants such as fumes, odors, dust and gases, and such hazards as moving machinery and unprotected heights.

The claimant does not receive mental health treatment and takes only a mild anti-depressant, which she herself stated helped her depression. Her mental impairment would not cause any significant limitations in her ability to perform work-related activities aside from moderately limited ability to tolerate the stress associated with day-to-day activity noted by Dr. Sewell.
...

TR 26-27

The ALJ properly evaluated all of the objective medical evidence of record and the claimant's level of activity in determining that Plaintiff retained an RFC for light work, and the Regulations do not require more. Because there is substantial evidence in the record to support the ALJ's Residual Functional Capacity determination, the ALJ's determination must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for DENIED be, and that the decision of the Commissioner be AFFIRMED.

38

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

E. CLIFTON KNOWLES
United States Magistrate Judge

39